JOURNAL ENTRY AND OPINION
{¶ 1} Pursuant to R.C. 2945.67, the State of Ohio appeals the judgment of the trial court that granted defendant Eugene Johnson's motion for a new trial. For the reasons set forth below, we reverse.
 {¶ 2} On June 13, 1995, defendant, Laurese Glover and Derrick Wheat were indicted for aggravated murder with a firearm specification in connection with the February 10, 1995 murder of Clifton Hudson. The matter proceeded to a joint jury trial on January 8, 1996. Defendant and co-defendant Wheat were convicted of murder of Clifton Hudson with a firearm specification. Co-defendant Glover was convicted of murder but acquitted of the firearm specification.
 {¶ 3} A synopsis of the evidence was set forth in State v. Johnson
(Jan. 16, 1997), Cuyahoga App. No. 70234 as follows:
 {¶ 4} "Clifton Hudson, Jr., age 19, was shot to death on February 10, 1995, on Strathmore Road in East Cleveland. The State's principal witness to the shooting was Tamika Harris, age 15, who was on her way home around 5:45 p.m. with her friend, Monique, when they heard gunshots. Monique ran off, but according to Tamika's testimony, she observed a boy shooting another boy. The victim was lying on the sidewalk and she heard five more shots as she stood up against the bridge.
 {¶ 5} "Ms. Harris said she saw a black four-by-four vehicle stopped on Strathmore at the time of the shooting. The assailant later identified by Ms. Harris as defendant Eugene Johnson, had come from the rear of the van toward the victim, after two shots were fired. After the last shots were fired, the black four-by-four turned, sped off and turned right on Manhattan Avenue, almost hitting another car.
 {¶ 6} "At trial, Ms. Harris identified Eugene Johnson as the person she saw shoot and kill the unarmed victim on Strathmore. She stated that Johnson had a black gun in his hand; she observed him running by her to get to the black four-by-four which had slowed down after turning the corner onto Manhattan. She said Johnson ran toward the vehicle and that she did not see him thereafter. The vehicle then drove down Manhattan and turned onto Ardenall. Ms. Harris observed the victim lying on the ground. She said he yelled "help" and that his eyeballs started rolling back up in his head. Ms. Harris further testified that she saw two black people in the Blazer. She said she observed defendant Johnson's face since it was light enough for her to see what was going on.
 {¶ 7} "The following day, Ms. Harris identified the black four-by-four at the East Cleveland Police Station. She was also shown three photographs by Detective Perry of the East Cleveland Police Department. She immediately identified the photograph of Eugene Johnson as the one who shot Hudson from among the three photos without advice as to whom to pick.
 {¶ 8} "Ms. Harris was able to identify Johnson's down jacket which was a Nautica brand. It is similar looking to a down Tommy Hilfiger jacket, which she had previously described in a statement to police. Eugene Johnson's down-filled Nautica jacket is maroon, blue and green in color. She also identified Johnson's hooded sweatshirt. Upon cross-examination, Ms. Harris testified that she made a written statement describing Johnson's clothing before she was shown his clothing and before she saw his photograph.
 {¶ 9} "* * * Sharon Rosenberg of the coroner's office testified that she * * * analyzed the swabs from the East Cleveland police. The swabs collected from the palm and back of both hands of defendant Wheat were consistent with gunshot residue indicating that he had fired a weapon, or his hands were very close to a weapon being fired. The gunshot residue found on Wheat's hands was not caused by a source other than gunshot residue because of the quantity of antimony and barium. The other two co-defendants' hands tested negative for gunshot residue. However, a pair of gloves found in the pocket of Eugene Johnson's jacket were analyzed by Ms. Rosenberg with the Atomic Absorption Kit. The palm of the left glove was consistent with gunshot residue. The palm of the right glove was inconclusive regarding gunshot residue.
 {¶ 10} "The Cleveland Indians jacket belonging to defendant Wheat was analyzed and found to have nitrite particles on the left sleeve, indicating, according to Rosenberg, that the sleeve was exposed to gunshot residue. There was no reaction on defendant Johnson's or Glover's jacket.
 {¶ 11} "* * *
 {¶ 12} "East Cleveland Detective Michael Perry testified he responded to Strathmore to investigate the shooting. Detective Perry received information that the suspect vehicle was a black Blazer driven by Glover which was located on Knowles at approximately 10:00 p.m. that evening. The police followed the Blazer to Ardenall where Wheat and Glover were arrested in front of Wheat's house. The vehicle was taken to the police garage. According to Detective Perry, defendant Wheat was wearing a Cleveland Indians jacket at the time of his arrest. Defendant Johnson was arrested at his home on Ardenall and his blue, green and maroon Nautica jacket was taken from him at the police station. The down jacket contained the pair of gloves which the BCI tested for lead residue. A sweatshirt was also taken from Johnson.
 {¶ 13} "Perry stated that the day after the shooting, he showed Tamika Harris a photo array. He handed her three photographs of Wheat, Glover and Johnson, but did not tell her which one to pick. Harris did not hesitate in identifying the photo of Johnson as the male that did the shooting on Strathmore. She also identified Johnson's Nautica jacket and sweatshirt and the black four-by-four Blazer belonging to Wheat which was later processed by BCI.
 {¶ 14} "* * *
 {¶ 15} "An expert forensic scientist and firearms examiner for BCI analyzed the five blotter sheets submitted. He found lead residue on the blotter sheets from the interior of the vehicle, and on the blotter sheet from the exterior area below the passenger side window. He testified that the lead residue was consistent with a firearm having been fired."
 {¶ 16} "* * *
 {¶ 17} "Detective Johnstone also testified to defendant Johnson's oral statement. Defendant Johnson told police that on February 10, 1995, he was with Laurese Glover and Derrick Wheat. They spent the afternoon smoking marijuana. He corroborated the statements of Wheat and Glover as to the Blazer trip and observing the shooting. He stated that he observed a tall, slender male wearing a dark brown jacket with a gun, shoot the victim. They continued to where Johnson was dropped off at his home. Johnson told police that at about 2:00 a.m. on the morning of February 11, 1995, Wheat's father called Johnson's home to talk to him about the shooting incident and to find out if Wheat was involved." State v.Johnson, supra.
 {¶ 18} More specifically, with regard to Tamika Harris' testimony, we note that she testified that she saw "[t]his boy shooting another boy." (Tr. 820). She identified defendant in court as the assailant. (Tr. 826). When asked if she was able to see his face at the time of the shooting, she stated, "Enough to identify him." (Tr. 833).
 {¶ 19} On cross-examination, defense counsel asked the following question:
 {¶ 20} "Q. * * * Now [in your statement to police] you were asked, could you identify the male that you saw firing the gun. And your answer was, no, I didn't see his face that clear. Am I misreading that?
 {¶ 21} "A. No.
 {¶ 22} "Q. That's what you said?
 {¶ 23} "A. Yes.
 {¶ 24} "Q. And this was your statement?
 {¶ 25} "A. Yes.
 {¶ 26} "Q. And at that time, you told the police when they asked you, `could you identify the male you saw firing the gun?' You said, `no, I didn't see his face that clear.' That's what you said?
 {¶ 27} "A. Yes."
(Tr. 856-857).
 {¶ 28} The questioning then continued as follows:
 {¶ 29} "Q. * * * Now it says, `can you describe the male that you saw at the Blazer, and shot the male on the sidewalk * * *?'
 {¶ 30} "A. No.
 {¶ 31} "Q. Is that what you said?
 {¶ 32} "A. Yes."
 {¶ 33} "* * *
 {¶ 34} "Q. * * * [I]n your first statement, on the 10th, `could you identify the male that you saw firing the gun?' And your answer was, `no, I didn't see his face that clear.' Didn't you?
 {¶ 35} "A. Yes.
 {¶ 36} "* * *
 {¶ 37} "The next day, you were shown three pictures, is that right?
 {¶ 38} "A. I think I was shown more than three.
 {¶ 39} "Q. And the next day, even though you said you could not; you couldn't identify the person because you didn't see his face, the next day, but you identified the defendant, Johnson as the one that did the shooting?
 {¶ 40} "A. Yes."
(Tr. 859-865). See, also redirect at Tr. 908-910.
 {¶ 41} Within defendant's direct appeal, his counsel argued that "Harris gave numerous conflicting statements regarding the description of the shooter and her identification of Defendant Johnson." (Appellant's Brief at 4). Appellate Counsel also argued that "Harris appears to have identified Defendant, whom she had previously stated the day of the incident that she could not identify, because of the clothing he was wearing in the photo she was shown." (Appellant's Brief at 8). He further maintained that she had been shown a suggestive photo array. In affirming the conviction upon direct appeal, this court rejected the contention that Harris' eyewitness identification should not have been admitted because she had stated that she did not see the assailant's face that clearly, then identified him from a photo array. This court stated, "defendant can demonstrate neither suggestive identification procedures nor unreliable identification." State v. Johnson (Jan. 16, 1997), Cuyahoga App. No. 70234, at 15. The convictions of the co-defendants were also affirmed on appeal. See State v. Wheatt (Jan. 16, 1997), Cuyahoga App. No. 70197, discretionary appeal disallowed in (1997),78 Ohio St.3d 1512, 679 N.E.2d 309; State v. Glover (Jan. 16, 1997), Cuyahoga App. No. 70215.
 {¶ 42} Within Glover's direct appeal, this court noted:
 {¶ 43} "Harris talked to the police at the scene and made a statement that day at the police station. In her statement, Harris said she saw a guy get out of a black, four-by-four with tinted windows and pull a gun from his pants. At trial, Harris testified she did not observe a male get out of the black vehicle and did not see from where the gun came. Harris testified she assumed the male came from the Blazer. In the statement,Harris said she did not see the face of the shooter that clearly andcould not identify him. 1She also stated the suspect was 5'7" in height or taller with a medium complexion. The perpetrator was wearing a red and blue Tommy Hilfiger coat, a black skullcap and black pants.
 {¶ 44} "Harris returned to the police station the next day and was shown pictures of the three defendants. Harris identified Johnson's picture without hesitation as being that of the shooter. She also identified a maroon, blue, and green Nautica coat and black hooded sweatshirt as the clothing worn by the suspect. The clothing belonged to Johnson. Harris testified that Nautica and Tommy Hilfiger coats are very similar. Harris was shown appellant's vehicle, a GMC Jimmy, which she identified as the one she observed at the scene of Hudson's murder." (Emphasis added). State v. Glover (Jan. 16, 1997), Cuyahoga App. No. 70215.[1]
 {¶ 45} The record further reveals that on October 11, 1998, Tamika Harris was interviewed in connection with this case. An unauthenticated copy of the transcript of this interview was submitted to the trial court in support of Derrick Wheat's July 1999 Motion for a New Trial/Alternative Motion Petition for Post-Conviction Relief. In relevant part, it contains the following exchange:
 {¶ 46} "JA: Did you get a good look at the guy running behind the truck?
 {¶ 47} "TH [Harris]: No, but I know what he had on. He had on a pullover hooded black sweater with a jacket over it."
 {¶ 48} In affirming the denial of Wheat's motion, this court stated:
 {¶ 49} "The evidence that Defendant-Petitioner is now claiming is "new evidence" was available to the defense at the time of trial and, indeed, some of the evidence was used at trial. Petitioner's argument is flawed for numerous reasons:
 {¶ 50} "* * *
 {¶ 51} "* * *
 {¶ 52} "The photographs, which Defendant-Petitioner claims prove that Tamika Harris' view of the scene was obstructed, were exhibits used at trial and marked as State's Exhibits 21-24.
 {¶ 53} "Said photographs were shown to the jury at trial and it was explained that Harris had an unobstructed view of the shooting. (Tr. 650-653, 672-673, 1016-1017)." State v. Wheatt (Oct. 26, 2000), Cuyahoga App. No. 77292.
 {¶ 54} On January 23, 2004, defendant filed a motion for a new trial. In relevant part, he alleged that Tamika Harris "has come forward to state that her identification of Eugene Johnson was in error. She states that she identified the photo of Mr. Johnson solely because he was wearing a coat or jacket similar to that which the shooter was wearing." He also maintained that this evidence could not have been previously discovered with reasonable diligence. The January 8, 2004 affidavit of Tamika Harris was submitted in support of the motion. In relevant part, it provided:
 {¶ 55} "4. I told the police that I did not get a clear look at the face of the shooter, and could not identify him. I only described the shooter's clothing.
 {¶ 56} "5. The next day members of the East Cleveland Police Department showed me three photos of black males. I did not recognize any of their faces. One of them was wearing a jacket like the one the shooter was wearing. I identified him as the shooter only because of the jacket he was wearing in the photo. * * *
 {¶ 57} "6. I later testified at trial that I recognized Eugene Johnson in the photo as the person I saw doing the shooting. This was not correct. I also identified him in court. My in-court identification was based on my having seen him in the photo, not from seeing him do the shooting or from recognizing him from the scene. I did not really recognize Eugene Johnson as the shooter at all. I picked the photo of Eugene Johnson only because he was wearing a coat in the photo like the one the shooter was wearing. * * *."
 {¶ 58} The trial court held an evidentiary hearing in the matter. The record demonstrates that Tamika Harris visited the InnocentInmates.org website and read about this matter including "testimony by a witness or whatever, who I guess never testified before." (Tr. 32). Later, in December 2002, Tamika Harris sent three emails to defendant through the InnocentInmates.org website. A couple of days later, an investigator talked to her and she then talked to defendant's mother. In the spring of 2003, or earlier, she went to the office of defendant's present attorneys and prepared an affidavit. She prepared a second affidavit for them in January 2004.
 {¶ 59} Tamika stated that the matter "did not sit right on her conscience." (Tr. 25). She stated:
 {¶ 60} "I do feel as if I was persuaded to drag it out more than it was because I — what I seen wasn't much, you know. The identification thing, it wasn't much, and the prosecutors make it seem like it was more, as if I had seen more, you know, than it was. * * * I'm thinking to myself, well, the guy that I seen do the shooting or anything, I never clearly seen his face. And that's one reason why I feel that way, I never really seen his face and I know for a fact that if there were more people in the line-up, I never would have picked Eugene, if they never would have presented that picture to me with the outfit that he had on. I never would have picked his picture." (Tr. 26-29).
 {¶ 61} She was also troubled because her youngest son's father had just been sent to jail. She claimed that she chose defendant from a photo array based upon the position of the officer's hand. According to Harris, after the 1998 interview she began to express doubts to the investigator.
 {¶ 62} Rod Kee, director of Innocent Inmates of Ohio, testified that he publishes on the organization's website cases of inmates whom he believes to be wrongfully convicted. He further testified that he retained attorney Derrick Farmer to follow-up on Harris's emails. Kee claimed, however, that Farmer did little other than to take his money. In 2003, he spoke to an Akron law firm about the matter, but they quoted a fee which the Johnson family could not afford. The family later contacted Mike Goldberg, and Brett Murner, defendant's co-counsel, who later began to work on the case.
 {¶ 63} The court held a second hearing on the matter on September 17, 2004. Harris reiterated her earlier testimony. The trial court subsequently granted the motion. The state was granted leave to appeal and raises two interrelated assignments of error for our review. The assignments of error state:
 {¶ 64} "The common pleas court erred in finding that defendant was unavoidably prevented from timely filing his motion for a new trial."
 {¶ 65} "The trial court erred in granting Johnson's motion for a new trial."
 {¶ 66} Within these assignments of error, the state maintains that the trial court abused its discretion in concluding that the motion was timely because it was filed more than 120 days after conviction, and also more than 120 days after discovery of Tamika Harris's current position. The state further maintains that the statements are similar to the evidence presented at trial and therefore does not disclose the strong possibility that it will change the result of the trial.
 {¶ 67} Motions for a new trial made pursuant to Crim. R. 33 are reviewed under the abuse of discretion standard. State v. Schiebel
(1990), 55 Ohio St.3d 719, 564 N.E.2d 502. The Supreme Court has defined abuse of discretion as implying the trial court's judgment was arbitrary, unreasonable, or unconscionable, see State v. Sage (1987),31 Ohio St.3d 173, 510 N.E.2d 343.
 {¶ 68} To prevail on a Crim.R. 33(A)(6) motion for a new trial on the grounds of newly discovered evidence, the movant bears the burden of demonstrating that the new evidence: "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v. Hawkins
(1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227, quoting State v. Petro
(1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus.
 {¶ 69} Further, in accordance with Crim.R. 33(B):
 {¶ 70} "Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period." (Emphasis added.)
 {¶ 71} Thus, an untimely motion for new trial based on newly discovered evidence must show, by clear and convincing proof, that the defendant was "unavoidably prevented" from discovering the new evidence.State v. Fortson, Cuyahoga App. No. 82545, 2003-Ohio-5387. The "phrases `unavoidably prevented' and `clear and convincing proof' do not allow one to claim that evidence was undiscoverable simply because affidavits were not obtained sooner." Id.; State v. Williams, Butler App. No. CA2003-01-001, 2003-Ohio-5873.
 {¶ 72} In this matter, the record contains no "clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely." Defendant was convicted in 1996. Tamika spoke with an investigator working for defendants between 1998 and 2000. She signed an affidavit outlining her current position in early 2003. She signed a second affidavit in January 2004, and the motion was filed approximately two weeks later. The record demonstrates that the evidence was obtained no later than early 2003, when Harris signed the first affidavit, but the motion was not filed until almost one year later. Accord State v. Kimbrough, Cuyahoga App. No. 84863, 2005-Ohio-1320;State v. York, Greene App. No. 2000-CA-70, 2001-Ohio-1528. See, also, InState v. Stansberry (Oct. 9, 1997), Cuyahoga App. No. 71004, in which this court stated:
 {¶ 73} "Without some standard of reasonableness in filing a motion for leave to file a motion for new trial, a defendant could wait before filing his motion in the hope that witnesses would be unavailable or no longer remember the events clearly, if at all, or that evidence might disappear. The burden to the state to retry the case might be too great with the passage of time. A defendant may not bide his time in the hope of receiving a new trial at which most of the evidence against him is no longer available.
 {¶ 74} "A trial court must first determine if a defendant has met his burden of establishing by clear and convincing proof that he was unavoidably prevented from filing his motion for a new trial within the statutory time limits. If that burden has been met but there has been an undue delay in filing the motion after the evidence was discovered, the trial court must determine if that delay was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay. That determination is subject to a review by an abuse of discretion standard."
 {¶ 75} Although defense counsel complained about the actions and inactions of prior counsel subsequent to that time period, the rule directs that the proper focus is the discovery of the evidence and not the date that reliable counsel was obtained.
 {¶ 76} In any event, the evidence offered would have had no material effect on the outcome of the trial as Harris had acknowledged from her first meeting with police, and the defense repeated throughout the trial and appeal of this matter, that she did not clearly see the attacker's face and that she identified defendant from the photo array based upon his clothing. Moreover, the trial court erred insofar as it accepted the claim that the identification was the result of a suggestive police practice as this claim was rejected in defendant's direct appeal, and this finding remains the law of the case. We further note that forensic evidence supports the conviction as the residue found on Johnson's left glove was consistent with gunshot residue, and lead residue was found in the vehicle.
 {¶ 77} In accordance with the foregoing, we conclude that the judgment of the trial court is not reasonable and that the trial court abused its discretion in granting the motion for a new trial.
 {¶ 78} The judgment is reversed.
 {¶ 79} This cause is reversed for further proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellee his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., concurs in judgment only (see attached concurringopinion).
 Gallagher, J., concurs in judgment only with majority opinion andconcurs with concurring opinion.
[1] Within Wheatt's direct appeal, this court noted:
"[w]e do not see the conviction of the appellant as being grounded in Ms. Harris's identification of the co-defendant, Johnson."
 CONCURRING OPINION