[Cite as *State v. Glover*, 2016-Ohio-2833.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### Nos.   102828, 102829, and 102831

---

## STATE OF OHIO

### PLAINTIFF-APPELLANT

vs.

## LAURESE GLOVER, ET AL.

### DEFENDANTS-APPELLEES

---

### JUDGMENT:
### AFFIRMED AND REMANDED

---

Criminal Appeals from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-95-324431-A, CR-95-324431-B,
and CR-95-324431-C

**BEFORE:**   Boyle, J., E.A. Gallagher, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**   May 5, 2016

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Anthony Thomas Miranda
           Daniel T. Van
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEES**

**For Laurese Glover**

Carmen P. Naso
Milton A. Kramer Law Clinic
11075 East Boulevard
Cleveland, Ohio   44106

Mark A. Godsey
Ohio Innocence Project
University of Cincinnati
P.O. Box 210040
Cincinnati, Ohio   45221

**For Eugene Johnson**

Brett Murner
208 N. Main Street
Wellington, Ohio   44090

James E. Valentine
323 Lakeside Avenue, West
Suite 450 Lakeside Place
Cleveland, Ohio   44113

**For Derrick Wheatt**

Brian Howe
Ohio Innocence Project
University of Cincinnati
P.O. Box 210040
Cincinnati, Ohio   45221

Carmen P. Naso
Milton A. Kramer Law Clinic
11075 East Boulevard
Cleveland, Ohio   44106

MARY J. BOYLE, J.:

{¶1}   In this consolidated appeal, plaintiff-appellant, the state of Ohio, appeals the trial court's decision granting the motions for a new trial filed by defendants-appellees, Eugene Johnson, Laurese Glover, and Derrick Wheatt.   The state raises the following three assignments of error:

> I.   The trial court erred in granting appellees leave to file motions for new trial.
>
> II.   The trial court erred in granting appellees' motions for new trial.
>
> III.   The trial court erred in excluding the state's evidence at the hearings on appellees' motions.

{¶2}   Finding no merit to the appeal, we affirm and remand the case for a new trial.

## A.   Procedural History

{¶3}   In January 1996, appellees were convicted of murder in connection with the shooting death of 19-year-old Clifton Hudson on February 10, 1995, on Strathmore Avenue in East Cleveland.   Appellees were juveniles at the time of the murder and were bound over to the common pleas court pursuant to Juv.R. 30, where they were tried together as adults.   We summarize the evidence presented at their trial as follows.

### 1.   Trial

{¶4}   Tamika Harris, who was 14 years old at the time of the murder, was the state's sole eyewitness.   Harris testified that she and a girlfriend were walking southbound on Strathmore Avenue approaching an overpass at approximately 5:45 p.m.

when they heard two gunshots. Harris looked under the bridge and observed the shooter come from behind a black Chevy Blazer type truck that was stopped on Strathmore by the post office driveway. The shooter, who was standing in the street, fired five more shots at Hudson, who was on the sidewalk. According to Harris's testimony, she observed "a boy shooting a boy."

{¶5} After the shooting, the Blazer sped down Strathmore, under the bridge, and turned right on Manhattan Avenue, almost hitting another car. The shooter, who was running after the Blazer, ran past Harris, and the Blazer slowed down. The shooter approached the Blazer and disappeared behind it. Although Harris did not see the shooter get into the Blazer, she assumed he entered the vehicle because she did not see him again after it sped away a second time. Harris testified that she saw the face of the shooter as he ran past her and positively identified Johnson as the shooter at trial.

{¶6} Harris talked to police at the scene and made a written statement later that night at the East Cleveland police station. Harris told police the shooter had a medium complexion, was taller than 5'7", and was wearing "a red and blue Tommy Hilfiger coat, black skully, and black pants." When police asked Harris if she could identify the male she saw firing the gun, she replied, "No, I didn't see his face that clear." Despite that, the day after the murder, she identified Johnson as the shooter from a photo array. She also identified Johnson's hooded sweatshirt and Nautica down jacket as the shooter's clothing, and the black Blazer as the one she had seen on Strathmore at the time of the murder. The Nautica jacket was similar to the down Tommy Hilfiger jacket she

described in her previous statement. Detective Michael Perry testified that the police did not direct Harris's identification of the shooter, his clothes, or the Blazer, though there was only one black Blazer in the police garage.

{¶7} Wheatt, Glover, and Johnson were arrested within hours of the shooting. Johnson was wearing a blue, green, and maroon Nautica down jacket over a black hooded sweatshirt at the time of his arrest. In the presence of their parents, they each gave a statement to police and independently conveyed the same story that they were in the black Blazer on Strathmore at the time of the shooting and happened to witness the murder. According to their statements, Glover was driving, Wheatt sat in the front passenger seat, and Johnson sat in the back seat. They each stated that the shooter was a thin, light-skinned black man. Wheatt and Glover indicated the shooter was wearing a blue jacket. Johnson, however, stated the shooter's jacket was brown.

{¶8} The Ohio Bureau of Criminal Investigation processed the Blazer for gunshot residue. There were no firearms found in the vehicle but forensic scientists found lead particles on the exterior passenger-side door below the window, the interior passenger-side door armrest, and the front passenger seat bottom. An expert at trial testified that the lead particles were consistent with gunfire.

{¶9} Detective Vincent Johnstone testified that he conducted an atomic absorption spectroscopy test ("AAS test") on Wheatt and Johnson around 2:00 or 3:00 a.m. after they were in police custody on February 11, 1995. Johnstone swabbed their hands with a Q-tip swab and sent the swabs, along with ones from Glover, to the

Cuyahoga County Coroner's Office. Both sides of both of Wheatt's hands were positive for antimony and barium. Based on this evidence, the state's expert concluded that Wheatt either fired a weapon or that his hands were "very, very close" to a weapon as it was fired. Johnson and Glover's hands were negative for gunshot residue. However, test results on the palm of Johnson's left glove were consistent with gunshot residue.

{¶10} The defense presented two witnesses. Leroy Malone testified he had known all three defendants since they were in kindergarten because they lived in the neighborhood. Malone was parking his car on Ardenall Avenue, one street over from Strathmore, when he heard five gunshots. He then observed a black Ford Bronco with tinted windows driving toward him with three men inside. There was a fourth man running behind the Bronco. Malone testified he could see the side of the man's face as he was running and that he was not Johnson, who was darker and taller. The man stopped, put something in his pants, and ran down Shaw Avenue. According to Malone, he never got into the vehicle.

{¶11} Eric Reed lived on Strathmore at the time of the murder. He stated that he was watching T.V. when he heard gunshots. He looked out the window and saw a man lying on the ground and another man going through his pockets. Reed described the man who was standing over the victim as a light-skinned black male, about 5 feet 11 inches in height, wearing a dark jacket with a hooded sweatshirt. He testified that none of the defendants resembled the man he saw. He also stated that he did not notice any vehicle on the street.

**{¶12}** The jury found all three defendants guilty of murder, and the trial court subsequently sentenced them to 15 years to life in prison on the murder charge. Johnson and Wheatt were also convicted of a three-year firearm specification that was ordered to be served consecutive to their 15 years to life prison term. Their convictions were all affirmed on appeal. *State v. Glover*, 8th Dist. Cuyahoga No. 70215, 1997 Ohio App. LEXIS 98 (Jan. 16, 1997); *State v. Wheatt*, 8th Dist. Cuyahoga No. 70197, 1997 Ohio App. LEXIS 96 (Jan. 16, 1997); and *State v. Johnson*, 8th Dist. Cuyahoga No. 70234, 1997 Ohio App. LEXIS 100 (Jan. 16, 1997).

2. *Postconviction Proceedings*

**{¶13}** Over eight years later, in July 2004, Johnson filed a motion for a new trial after Harris averred in an affidavit that her identification of him was in error. Specifically, Harris testified that she improperly identified Johnson as the shooter because the photo array presented by police was unduly suggestive. The trial court granted Johnson a new trial in September 2004. In November 2004, Wheatt and Glover each filed a motion for leave to file a motion for a new trial, arguing they were also entitled to a new trial based on Harris's recanted testimony. While their motions for a new trial were pending, this court reversed the trial court's judgment granting Johnson a new trial. *State v. Johnson*, 8th Dist. Cuyahoga No. 85416, 2005-Ohio-3724. The trial court subsequently denied Glover and Wheatt's motions for a new trial, which Wheatt appealed and this court affirmed. *State v. Wheatt*, 8th Dist. Cuyahoga No. 86409, 2006-Ohio-818.

**{¶14}** In January 2009, appellees obtained leave and filed another motion for a new trial, asserting that recent advances in the forensic science of gunshot residue warranted a new trial. They argued newly discovered scientific evidence demonstrated that evidence of gunshot residue collected in their case was unreliable. The new method, known as Scanning Electron Microscopy/Energy Dispersive X-ray Spectroscopy (SEM/EDS), determines whether lead, barium, and antimony particles are fused or bonded together, not whether these elements are merely present at some level as under AAS. Appellees argued that in light of SEM/EDS testing, the state's expert could no longer testify to a reasonable degree of scientific certainty that the elements she tested under the AAS test are consistent with gunshot residue. The trial court denied the motion. In affirming the trial court's judgment, this court held that just because SEM/EDS testing is more accurate than AAS, it does not invalidate AAS testing. *State v. Wheat*, 8th Dist. Cuyahoga No. 93671, 2010-Ohio-4120, ¶ 38; *State v. Glover*, 8th Dist. Cuyahoga No. 93623, 2010-Ohio-4112, ¶ 26.

**{¶15}** Since their conviction, the appellees have also pursued federal habeas actions, which have proven unsuccessful. But in *Johnson v. Gansheimer*, N.D.Ohio No. 1:06 CV 2816, 2009 U.S. Dist. LEXIS 87690 (Sept. 21, 2009), the court noted that the magistrate found that "Petitioner [has] presented evidence of innocence strong enough to persuade the Magistrate that the underlying trial may have been compromised." That showing, however, is only sufficient "to excuse Petitioner's procedural default and allow review of the claims raised in the Writ; it does not itself suffice to establish an

independent constitutional claim." *Id.* The court ultimately found that Johnson was not entitled to federal habeas corpus relief. *Id.* Wheatt and Glover, who have also maintained their innocence, were also unsuccessful in their pursuit of habeas relief. *See Glover v. Morgan*, N.D.Ohio No. 1:12 CV 267, 2013 U.S. Dist. LEXIS 38947 (Mar. 4, 2013); *Wheat v. Bradshaw*, N.D.Ohio No. 1:12 CV 266, 2013 U.S. Dist. LEXIS 38948 (Mar. 4, 2013).

### 3. *Proceedings Underlying Instant Appeal*

{¶16} On August 26, 2014, Glover and Wheatt filed in the trial court a joint motion for leave to file a motion for new trial instanter based on newly discovered evidence contained in the police reports that had never been previously disclosed to the defendants. They attached the police reports as well as their proposed motion for a new trial as exhibits. Johnson filed the same motion on December 5, 2014, relying on the same evidence and asserting the same grounds as Glover and Wheatt. The appellees identified a letter dated June 24, 1998, wherein First Assistant County Prosecutor Carmen Marino "directed" the East Cleveland police to deny all public records requests associated with this case and to send the entire file to the prosecutor's office. Through the Ohio Innocence Project and Johnson's counsel, however, the appellees were able to obtain the police reports in late August 2014 through another public records request. Appellees asserted that the police reports contained exculpatory evidence that had been suppressed in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶17} Appellees specifically pointed to the names of two previously undisclosed witnesses to the shooting: Gary Petty and Eddie "Dante" Petty. According to the police reports dated February 12, 1995 and February 15, 1995, these two witnesses saw the shooting from the south on Strathmore — the opposite angle as Harris. Dante's account came from the statement provided to police by his mother, Monica Salters, whereas Gary was personally interviewed by an officer. According to the two brothers' accounts, the shooter, who they described as a 5'0 to 5'5" tall, dark-skinned black man, walked out of the nearby post office parking lot with his hands in his pockets, pulled out a gun, and shot the victim. Dante additionally reported to his mother that the "suspect is, or may be the brother" of one of his female classmates.

{¶18} Appellees also emphasized information contained in the police reports regarding statements made by Clifton's brother, Derek Bufford, who reported threats that had been made against him and the victim. According to Derek, the day before the shooting, Clifton told him "some niggas rolled on [sic] me and pulled out a shotgun." Derek also told police that someone had shot at him, just a week before the murder while he was walking near Hayden Avenue and Shaw Avenue. He stated that several unknown men in a grey Cavalier pulled up and started shooting. The reports further indicated that the police showed Derek pictures of all three appellees and that Derek was unable to identify any of the appellees as the people who had shot at him from the Cavalier.

{¶19} According to the appellees, the suppressed evidence "eviscerates" the state's theory at trial and calls into question the reliability of the state's evidence presented at trial.

{¶20} On August 28, 2014, the trial court granted Glover and Wheatt's motion for leave to file motion for new trial instanter and subsequently held a hearing on their motion for a new trial on January 29, 2015. Appellees presented the testimony of Richard Drucker, an attorney who represented Derek Wheatt at the original trial in 1996. Drucker testified as to the discovery procedures at the time of appellees' trial, explaining that the state's general discovery practice at that time was not to share hard copies of police reports. According to Drucker, the prosecutors, back then, would read "summaries" of the police reports out loud. With respect to the underlying case, Drucker testified that he remembered the case well and that he had never been informed of the exculpatory information in the police reports obtained by the appellees. Specifically, Drucker testified that he never knew that two witnesses reported seeing the shooter walk from the post office parking lot or that one of the Petty brothers claimed to have recognized the assailant. Drucker further testified that he was never told about the threats on the victim and the victim's brother days before the shooting — information that he would have investigated had he known.

{¶21} The state presented the testimony of Michael Horn, the only prosecutor assigned to the case and who handled the prosecution and trial of the appellees. Horn acknowledged that he did not recall specifically what he orally disclosed in this case as

part of discovery but testified that his practice in every case was to disclose exculpatory evidence. Horn further acknowledged that the discovery response filed in 1995 indicated that "no exculpatory materials are available in the possession of the prosecutor's office." According to Horn, he did share exculpatory evidence in this case, and therefore, the checking of that box was simply a mistake.

{¶22} On cross-examination, Horn agreed that the subject matter of the Petty brothers' statements and Derek Bufford's statement were exculpatory and subject to disclosure under *Brady,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. He further testified that, although he did not remember reading those statements prior to trial, he would have given the defense this information based on his procedure for discovery. Horn acknowledged, however, that he could only share with defense counsel what the police had provided to him.

{¶23} Appellee Johnson's hearing was held on February 13, 2015, at which the parties stipulated to the entire record from the January 2015 hearing, including the admission of the exhibits and the full trial record.

{¶24} On March 26, 2015, the trial court granted all three appellees' motions for a new trial, finding that the state suppressed evidence in violation of *Brady*. Relying on the cumulative effect of the evidence suppressed, the trial court found that "there is a reasonable probability that if the suppressed evidence had been disclosed to the defense at the time of trial, the result of the proceeding would have been different."

{¶25} From that decision, the state's appeal follows.

## B. Leave to File Motion for a New Trial

**{¶26}** In its first assignment of error, the state argues that the trial court erred in granting the appellees' leave to file a motion for a new trial. The state contends that the appellees were aware of the letter written by Carmen Marino as early as 1999 but "presented no evidence that they attempted to obtain the 'newly discovered evidence' contained in the police report until 2013." The state maintains that the appellees failed to exercise due diligence in obtaining the police reports. We disagree.

**{¶27}** Crim.R. 33(B) provides that a motion for a new trial upon the ground of newly discovered evidence must be filed within 120 days after the verdict was rendered unless "it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely" within the 120-day period. To seek a new trial based on new evidence more than 120 days after the verdict, a defendant must first file a motion for leave, showing by clear and convincing proof that he has been unavoidably prevented from filing a motion in a timely fashion. *State v. Stevens*, 2d Dist. Montgomery Nos. 23236 and 23315, 2010-Ohio-556, ¶ 10, citing *State v. Parker*, 178 Ohio App.3d 575, 2008-Ohio-5178, 899 N.E.2d 183, ¶ 15 (2d Dist.). "[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v.*

*Davis*, 10th Dist. Franklin No. 03AP-1200, 2004-Ohio-6065, ¶ 11, citing *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984).

{¶28} If the trial court determines that the documents submitted in support of a motion for leave for a new trial clearly and convincingly demonstrate the movant was unavoidably prevented from discovering the evidence, "the court must grant the motion for leave and allow the motion for new trial to be filed." *State v. Trimble*, 11th Dist. Trumbull No. 2013-P-0088, 2015-Ohio-942, ¶ 16.

{¶29} The 1998 Marino letter to the East Cleveland Police Department is not the newly discovered evidence that supports the appellees' motions for leave to file a motion for a new trial and motions for a new trial instanter. Instead, the letter merely evidences that the appellees were prevented from discovering the suppressed police reports. The record reflects that the appellees had no knowledge of the exculpatory information contained in the police reports; nor did they have any reason to believe that the police reports contained improperly suppressed exculpatory evidence. Notably, the state represented in its 1995 discovery response that it had no exculpatory evidence in its possession. Thus, while the appellees' motion for a new trial was untimely, their motion for leave to file a motion for a new trial and the supporting documents clearly and convincingly demonstrate that the appellees were unavoidably prevented from discovering the evidence. Indeed, the police reports at issue were in the exclusive control of the state.

**{¶30}** We find no error in the trial court's grant of leave for the appellees to file their motion for a new trial.

**{¶31}** The first assignment of error is overruled.

## C.   Granting of the Motion for New Trial

**{¶32}** In its second assignment of error, the state argues that the trial court erred in granting appellees' motions for a new trial.   The state presents several different grounds as to how the trial court erred.   For the sake of clarity, we will address their arguments out of order.

### 1.   Brady *Standard and Our Standard of Review*

**{¶33}** In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   *Brady,* 373 U.S.   at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; *see also State v. Treesh*, 90 Ohio St.3d 460, 475, 739 N.E.2d 749 (2001).   This rule also applies to impeachment evidence.   *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).   Evidence favorable to the defendant "shall be deemed material only if there is a reasonable probability, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus, following *Bagley*. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.   *Id.*

**{¶34}** Moreover, a reviewing court should consider the cumulative effect of all nondisclosures in determining whether reversal is required. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "Whereas each bit of omitted evidence standing alone may not be sufficiently material to justify a new trial, the net effect, however, may warrant a new trial." *State v. Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928, ¶ 33, citing *Kyles* at 434.

**{¶35}** The defendant carries the burden to prove a *Brady* violation rising to the level of a denial of due process. *See State v. Kulchar*, 4th Dist. Athens No. 10CA6, 2015-Ohio-3703, ¶ 42, citing *State v. Iacona*, 93 Ohio St.3d 83, 92, 752 N.E.2d 937 (2001). We review a *Brady* materiality question on appeal as a matter of law and therefore apply a de novo standard of review. *See State v. Fox*, 4th Dist. Ross No. 11CA3302, 2012-Ohio-4805, ¶ 25, citing *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 12-13. *See also United States v. Bullock*, 130 Fed.Appx. 706, 722 (6th Cir.2005), citing *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir.1991) ("The standard of review for the materiality of a purported *Brady* violation is de novo because it presents a mixed question of law and fact.").

2. *Suppressed Evidence*

**{¶36}** The state argues that the trial court erred in finding that the statements were suppressed and newly discovered. The state attacks the trial court's reliance on defense attorney Drucker's testimony that he did not receive the information. The state further suggests that the trial court improperly penalized the state for following what was the

acceptable discovery practice at that time — the reading of police reports to defense counsel. We find the state's argument unpersuasive.

{¶37} The record reflects that Drucker testified that he is "positive that we weren't given this information." He further testified that defense counsel of all three appellees agreed to share all discovery and that this information was never discussed. And although Drucker admitted to not having specific recollection of certain matters in the case, he testified unequivocally that he did not receive this information. Conversely, Horn testified that he had no recollection of specifically sharing the contents of the police reports at issue, but testified as to his discovery practice in every case, which included the sharing of any exculpatory material. But Horn's testimony fails to account for the fact that he may not have been provided the police reports at issue. Even if they were not provided to Horn, the East Cleveland Police Department's knowledge is imputed to the state. *See Kyles,* 514 U.S. at 437-438, 115 S.Ct. 1555, 131 L.Ed.2d 490; *State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1990) ("Inasmuch as the police are a part of the state and its prosecutional machinery, * * * such knowledge on the part of a law enforcement officer must be imputed to the state.").

{¶38} Furthermore, the trial court specifically found Drucker's testimony more credible. We must defer to the trial court's factual findings on matters of credibility. *See Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, at ¶ 14 (deferring to trial court's finding of witness's credibility and noting that trial court "is in the best position to weigh the evidence and the credibility of the witnesses"). Notably, the

state's discovery response to the defense further supports the trial court's finding that the evidence was never provided to the defense. Finally, as this court has previously noted, "the most persuasive indication that the defense did not possess this evidence is the fact that the defense never used this evidence at trial." *Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928, at ¶ 28, citing *United States v. Stifel*, 594 F.Supp. 1525 (N.D.Ohio 1984).

{¶39} We find that competent, credible evidence exists that this information was never provided to the defense by the state and the trial court did not err in finding that the appellees satisfied their burden of demonstrating suppression.

*3. Exculpatory and Material*

{¶40} The state next argues that the trial court erred in finding that the statements at issue are exculpatory. According to the state, the evidence is not exculpatory and, therefore, not subject to disclosure by the state. The state further argues that, even if exculpatory, the evidence fails to satisfy the materiality test under *Brady*. We disagree.

{¶41} Exculpatory evidence is evidence that would tend to exculpate a defendant of guilt or reduce a defendant's penalty. This is the "favorable" evidence contemplated under *Brady* and its progeny, which also includes impeachment evidence bearing on the credibility of the state's witnesses. *See State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696, ¶ 43 (1st Dist.); *State v. Aldridge,* 120 Ohio App.3d 122, 145, 697 N.E.2d 228 (2d Dist.1997), citing *Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 ("Both exculpatory and impeachment evidence may be the subject of a

*Brady* violation, so long as the evidence is 'material.'"). The trial court identified the following six items of exculpatory evidence that cumulatively undermined the trial court's confidence in the verdict:

1.  The existence of the Petty brothers as exculpatory witnesses.

2.  Statements of the Petty brothers that the shooter came from a post office parking lot.

3.  Dante Petty identifying the shooter as a brother of a classmate.

4.  Clifton Hudson, the victim of the case, and his brother Derek Bufford were both threatened days before the murder.

5.  Derek Bufford was shot at from a grey Cavalier.

6.  Derek Bufford was shown photos of the three defendants and failed to identify them.

{¶42} At the January 2015 hearing on the motion for a new trial, the state's own prosecutor, who handled the underlying case, acknowledged that the contents of the reports at issue are exculpatory. Indeed, the Petty brothers were eyewitnesses to the shooting and their account undermined the state's theory at trial. They stated that the shooter came from the post office parking lot, not appellees' truck. Additionally, Dante Petty told police that he recognized the shooter as a brother of one of his 5th or 6th grade classmates — information that the police appeared not to have investigated. Further, the statements of Derek Bufford supported the appellees' defense and implicated other third parties who had an apparent motive to kill Clifton — something that the state never could establish between the appellees and Clifton. We find that this evidence meets the definition of exculpatory and should have been shared with the defense.

**{¶43}** The harder question to answer in this case is the issue of materiality. The failure to share exculpatory and impeachment evidence does not necessarily rise to the level of a constitutional violation under *Brady*; the violation arises if the evidence is "material" and not cumulative to other evidence offered at trial. *State v. Gibson*, 2d Dist. Butler No. CA2007-08-187, 2008-Ohio-5932, ¶ 25, citing *Bagley* at 676.

**{¶44}** The Supreme Court has explained, "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine confidence in the outcome of the trial." *Kyles*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (internal quotation marks omitted). "In the end, this standard not only protects defendants; by ensuring a fair trial, it also protects the system of justice as a whole." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 40.

**{¶45}** The issue of materiality involves an analysis of the strength of the state's case at trial. Where a defendant complains that he was not given access to exculpatory evidence, a reviewing court may overlook the error "where the admissible evidence comprises overwhelming proof of a defendant's guilt." *State v. Campbell*, 4th Dist. Adams No. 13CA969, 2014-Ohio-3860, ¶ 19. Indeed, "if the government fails to disclose *Brady* material, the defendant has a constitutional remedy for the nondisclosure

*only* if the defendant can show that there is a reasonable probability that 'the omission deprived the defendant of a fair trial.'" *United States v. Presser*, 844 F.2d 1275 (6th Cir.1988), quoting *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**{¶46}** The state argues that the suppressed statements are not material because they cannot overcome or diminish the collective persuasiveness of the state's evidence at trial. Specifically, the state points to the following evidence: (1) all three appellees admitted to being together at the scene at the time of the shooting; (2) physical evidence tied the appellees to the shooting, namely, Wheatt's hands were consistent with gunshot residue, Johnson's left glove was consistent with gunshot residue, and the Blazer contained lead residue on the front passenger's-seat bottom, side-door armrest, and exterior, and (3) Harris's testimony placed the appellees' vehicle at the post office driveway. The state further relies on Harris's testimony that the shooter was wearing the same clothes as Johnson as overwhelming evidence that the suppressed statements are immaterial. The state also argues that the Petty brothers' description of the shooter was more consistent with Harris's description and conflicted with the testimony of defense witness Eric Reed, who identified the shooter as "a light- skinned male."

**{¶47}** We disagree with the state's assessment of the exculpatory evidence as well as the strength of its own case. First, the Petty brothers' statements are critical because they observed the shooting from a different vantage point than Harris, one where they could see the rear of the appellees' Blazer truck and the post office parking lot.

Although Harris acknowledged that she never saw Johnson specifically exit or enter the Blazer, her testimony clearly inferred that Johnson had exited the truck to commit the murder. According to the Petty brothers' statements, however, the shooter came from the adjacent post office parking lot — not the appellees' Blazer. As noted by the trial court, the Petty brothers describe a single shooter who arrived independently of the black Blazer. The Petty brothers' statements, therefore, extinguish any connection between the shooter and the appellees' Blazer truck.

{¶48} Second, the Petty brothers' statements severely undermine Harris's identification of Johnson as the shooter because they contradict Harris's belief that the shooter came from the Blazer truck. Indeed, although Harris positively identified Johnson as the shooter at trial, her testimony was not without inconsistencies. Most notably, Harris positively identified Johnson despite having told the police at the scene that she did not get a clear look at the shooter's face. While the jury obviously found this inconsistency not fatal to Harris's identification, we are not convinced that the jury would have also been able to overcome the Petty brothers' statements, further calling Harris's identification into question.

{¶49} Third, without the connection between the shooter and the Blazer, the gunshot residue evidence presented at trial would have been less significant. Because of Harris's identification of Johnson as the shooter, the state presented a "two-shooter" theory, involving both Wheatt and Johnson, to correlate with their gunshot residue evidence. The state argued that Wheatt, who was seated in the front passenger seat,

must have started shooting at the victim from inside the passenger side of the truck and then passed the gun to Johnson, who exited the vehicle, walked around the back of the truck, and then followed the victim across the street to complete the shooting while the other appellees drove off without him. But if the shooting did not originate from the appellees' truck, the state's "two-shooter theory" does not make sense. It also calls into question the reliability of the state's gunshot residue evidence and lends credence to the defense's theory of environmental contamination or other sources.

{¶50} Finally, Derek Bufford's statements cast the state's evidence in a completely different light. His statements evidence that someone, other than the appellees, were out to get him and his brother. Notably, there was no connection established between the appellees and the victim at trial. While the prosecutor alluded to maybe a gang-related shooting in his opening statement, there was never any evidence offered to corroborate the prosecutor's speculation. Derek's statements, however, reinforce the defense's theory that the appellees were mere witnesses to the crime. Derek's statements further undermine the integrity of the police investigation in this case. The police appeared to have failed to investigate any connection between the owner of the grey Cavalier and the underlying shooting once Derek was unable to identify any of the appellees as being involved in the earlier attack.

{¶51} Considering the cumulative effect of the evidence suppressed, we find that our confidence in the jury's verdict is sufficiently undermined. We find a reasonable probability exists that the jury would have reached a different decision if the exculpatory

evidence had been known at trial. We therefore find that the trial court did not err in finding a *Brady* violation and granting the appellees' motion for a new trial.

### 4. *Prosecutor Marino's Reputation and Harris's Recanted Testimony*

**{¶52}** The state argues that the trial court reached its decision by considering evidence outside of the record, namely, the reputation of Marino as former first assistant county prosecutor, as well as the trial court's own personal opinion. Specifically, the state contends that the trial court's finding that Marino committed prosecutorial misconduct "in the willful and malicious suppression of this evidence" is not supported by the record and that the trial court sua sponte pursued such an attack on the former prosecutor. The state further argues that the trial court improperly considered Harris's testimony in postconviction proceedings as grounds for granting a new trial.

**{¶53}** We cannot agree that the trial court's discussion of Carmen Marino is central to the trial court's decision. While we acknowledge that the trial court expressed its strong opinion of Marino and his reputation, the trial court separately found a *Brady* violation based on the evidence suppressed and the particular facts of this case. To the extent that the trial court (1) referenced matters related to Marino that were not part of the record, or (2) made extemporaneous remarks as to Harris's testimony in a postconviction hearing, we find such references irrelevant. Indeed, any unnecessary legal analysis or commentary on the part of the trial court is not grounds for reversal where the trial court reached the correct judgment based on the underlying facts. *State ex rel. McGrath v. Ohio Adult Parole Auth.*, 100 Ohio St.3d 72, 2003-Ohio-5062, 796 N.E.2d 526, ¶ 8.

Here, based on our discussion above, the trial court's decision finding a *Brady* violation is well supported under the law and facts of this case.

   5.   *No Ruling on Johnson's Motion for Leave to File a Motion for New Trial*

**{¶54}** The state argues that Johnson never obtained leave to file a motion for a new trial and, therefore, his motion for a new trial was untimely and improperly granted.   We disagree.   As recognized by the Ohio Supreme Court, a trial court may consider and grant a motion for a new trial on *Brady* grounds, even when it would otherwise be untimely under the rules.   *Johnston*, 39 Ohio St.3d at 58-59, 529 N.E.2d 898.   It is clear from the record that the trial court implicitly granted Johnson leave by setting the matter for a hearing, considering the merits of his motion, and then ruling in his favor.   The trial court's failure to expressly rule on Johnson's motion for leave to file a motion for a new trial is not grounds for reversal.   *Id.* at 58 ("In reaching the merits, the trial court implicitly found that appellee was unavoidably prevented from filing the motion within Crim.R. 33(B) time limits.").

**{¶55}** Accordingly, having found that the trial court properly granted the appellees' motion for a new trial, the second assignment of error is overruled.

   **D. Exclusion of State's Evidence at Hearings**

**{¶56}** In its final assignment of error, the state argues that the trial court committed reversible error by excluding testimony from Derek Bufford and a state investigator, who the state sought to call and elicit testimony regarding the suppressed statements.   The state argues that their testimony was relevant to the materiality of the suppressed

statements and that the trial court acted "arbitrarily" in excluding their testimony. We disagree.

{¶57} "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Our inquiry, therefore, is limited to whether the trial court acted unreasonably, arbitrarily or unconscionably in deciding to exclude the testimony. *Id.*

{¶58} After having a sidebar with counsel, the trial court decided to exclude Derek from testifying, noting that he did not testify in the underlying trial. According to the state's proffer, Derek would have testified that (1) he does not recall his brother "giving a description of his attackers from the incident prior to the murder," and (2) he "was unable to identify his own attackers from the prior incident." At the later hearing for Johnson, the state also sought to call an investigator to testify as to a conversation he had with Eddie Dante Petty wherein Dante told him that he does not have any recollection of the shooter, the shooter's face, or where the shooter was.

{¶59} We cannot say that the trial court abused its discretion in excluding these witnesses from testifying. First, with respect to the investigator, the state sought to introduce inadmissible hearsay testimony under Evid.R. 803. We can hardly say that the exclusion was unreasonable, arbitrary, or unconscionable. Second, the trial court did not

arbitrarily exclude Derek's testimony. The trial court specifically explained her rationale on the record, stating the following:

> The Court feels the introduction of Mr. Bufford's testimony *at this point* would be improper for a variety of reasons including the fact that he did not previously testify. And it puts this Court in a position of ruling on a credibility issue of testimony since this is a new trial motion that's pending.
>
> In the event a new trial is granted, and occurs, the Defendants have, at any time, the right to request a bench trial which would mean this Court should not review or preview testimony that was not previously occurring in the prior trial.
>
> I think that puts this Court in an ethically untenable position. I'm not going to allow the testimony for that reason and the other reasons discussed at sidebar. The state has noted its objection.
>
> When the Court leaves the room, the State and the Defense will be here so that State can proffer. As I explained, it must be outside of my hearing in order for me to maintain the ability to hear the trial should they choose to have a trial.

{¶60} To the extent that the trial court allowed Drucker, the defense counsel, and Horn, the prosecutor, to testify at the hearing and made a credibility ruling with respect to suppression of evidence, their testimony was critical to the underlying *Brady* claim — not any adjudication of the appellees' guilt. Unlike Derek, the attorneys do not face the possibility of being called as a witness at a potential new trial for the appellees.

{¶61} Moreover, the appellees' reliance on Derek's statements was not for the purpose of his identifying the actual shooter. The appellees maintained that Derek's suppressed statements suggest that his brother was killed as part of some ongoing feud with people tied to a grey Cavalier. Derek's proffered statement does not change that.

Thus, even if the trial court should have allowed Derek to testify at the hearing, the exclusion of his testimony was harmless error.

{¶62} The third assignment of error is overruled.

{¶63} Judgment affirmed and the case is remanded for further proceedings consistent with this opinion.

It is ordered that appellees recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR