[Cite as *State v. Buehner*, 2021-Ohio-4435.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 109699 |
| v. | : | |
| MICHAEL BUEHNER, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED
**RELEASED AND JOURNALIZED:** December 16, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-02-417994-ZA

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Daniel T. Van, Assistant Prosecuting
Attorney, *for appellee.*

Randazzo Law, L.L.C., and Russell A. Randazzo, *for
appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Michael Buehner ("Buehner"), appeals from the trial court's judgment denying his motion for new trial. He raises the following assignments of error for review:

1. The trial court erred in denying Mr. Buehner's motion for new trial. Crim.R. 33(A)(2) and (6); Fifth and Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, [10 L.Ed.2d 215] (1963); *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988); *State v. Glover*, 2016-Ohio-2833 (8th Dist.).

2. The trial court erred in holding that Mr. Buehner failed to demonstrate a Brady violation. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, [10 L.Ed.2d 215] (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 [31 L.Ed.2d 104] (1972); *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988); *State v. Glover*, 2016-Ohio-2833 (8th Dist.).

3. The trial court abused its discretion by failing to follow the court of appeals remand and in effect reversing the Court of Appeals decision of November 1, 2018.

4. The trial court abused its discretion by holding the State of Ohio did not withhold properly discoverable evidence.

5. The trial court abused its discretion by holding the evidence withheld from defendant in advance of his trial was not material.

6. The trial court erred when it summarily dismissed in one sentence Mr. Buehner's *Napue* claim that the State of Ohio utilized false testimony.

{¶ 2} After careful review of the record and case law, we affirm in part, reverse in part, and remand the case to the trial court for a new trial.

## I. Procedural and Factual History

{¶ 3} In July 2002, a jury found Buehner guilty of two counts of murder and one count of attempted murder in connection with the shooting death of Jerry

Saunders ("Saunders").[1]  He was sentenced to an aggregate prison term of 18 years to life.

{¶ 4} At trial, the prosecution presented testimony indicating that on May 24, 2001, Buehner shot and killed Saunders during a drug transaction.  According to the prosecution, Buehner, who is a white male, arrived at the scene of the shooting in a black pickup truck.  He was sitting in the middle passenger's seat and was accompanied by an unidentified black male who was sitting in the passenger's seat and Randy Price ("Price"), a white male, who was driving the pickup truck.

{¶ 5} During the course of the police investigation, detectives interviewed and obtained a detailed description of all three occupants of the black pickup truck from Lawone Edwards ("Edwards"), who was selling drugs with Saunders at the time of the shooting.  Edwards identified Price in a photo array as the driver of the black pickup truck.  When shown a different photo array containing Buehner's photograph, however, Edwards could not confidently identify Buehner as the shooter and asked the detectives to perform a physical lineup. Price subsequently implicated Buehner as the person who shot Saunders.  Buehner was arrested, and, after viewing another lineup, Edwards identified him as the shooter.[2]

{¶ 6} Approximately 12 years later, a family friend of Buehner made a public-records request to the Cleveland Police Department concerning any and all police

---

[1] This court reversed the attempted murder conviction because of insufficient evidence. *See State v. Buehner*, 8th Dist. Cuyahoga No. 81722, 2003-Ohio-3348, ¶ 29 ("*Buehner I*").

[2] *See Buehner I* for a complete discussion of the facts supporting Buehner's convictions.

reports related to Saunders's homicide investigation. The Cleveland Police Department produced over 30 reports in response to the request, including a report detailing the eyewitness account of Debbie Anderson, a.k.a. Debbie Powell ("Anderson"). This report, dated September 27, 2001, summarizes the police interview of Anderson, who expressed that "the occupants of the black pickup truck were all black males." She described the shooter as "a light complexed [sic] black male * * * hair in braided hairstyle, slim build, 5′10″, in mid 20s."

{¶ 7} The reports also included the witness statements of Tierra Edwards ("Tierra"), Antoine Edwards ("Antoine"), and Gail Jenkins ("Jenkins"). The statement provided by Antoine did not provide significant information relating to the suspects' identities. In contrast, Tierra reported that she observed three individuals in the black truck. She identified the driver of the truck as a white male and the passenger of the truck as a black male. However, Tierra indicated that she "did not get a good look at the middle passenger in the truck." Jenkins also reported that she saw three suspects: a white driver of the truck and two black passengers. Significantly, Jenkins expressed that she observed the white male driving the truck brandish a gun and "fire two shots at the victim."

{¶ 8} After receiving the police records, Buehner, pro se and through different attorneys, filed several motions for leave to file a motion for a new trial and for postconviction relief. Collectively, the motions argued that Buehner's constitutional right to due process was violated by the state's failure to produce the statements of Anderson, Jenkins, and others in violation of *Brady v. Maryland*, 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He asserted that despite the state's indication during the discovery process that "[n]o exculpatory material [wa]s available to or in the possession of the Prosecuting Attorney," Anderson's statement contained exculpatory evidence because Anderson told police that the shooter and the other two individuals in the truck were black whereas Buehner is white. Buehner also asserted that inconsistencies in the statements provided by Jenkins and Tierra would have cast doubt on the testimony of Edwards and Price, who identified Buehner as the shooter at trial. Alternatively, Buehner argued that if the exculpatory materials were provided to the defense team during the discovery process, the defense team was ineffective for failing to present the evidence to the jury.

{¶ 9} In August 2017, the trial court denied Buehner's motions for leave to file a motion for a new trial and for postconviction relief, stating, in relevant part:

> Defendant has failed to demonstrate by clear and convincing proof that he was unavoidably prevented from discovery of the potential testimony of the witness, Debbie Anderson, as alleged by Defendant. Defendant's trial attorneys had knowledge of the existence of the witness and Defendant has not provided clear and convincing proof that the summary was not provided in discovery, not that the trial attorneys could not have learned of the existence of her statement without reasonable diligence. Significantly, missing from the trial attorneys' affidavit was an affirmative assertion that the police summary had not been provided in discovery. Likewise, the police summary of Ms. Anderson's oral statements is not new evidence because Defendant was not unavoidably prevented from discovering the facts relied on in the petition and motion. Furthermore, there is not clear and convincing evidence that Defendant would have been found not guilty but for the alleged failure to provide the police summary[.]

{¶ 10} In November 2018, this court reversed the trial court's judgment, finding the undisclosed witness statements of Anderson and Jenkins were exculpatory and that Buehner was unavoidably prevented from discovering the evidence at issue. *State v. Buehner*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432, ¶ 32 ("*Buehner II*"). Accordingly, the matter was remanded for a hearing "to consider Buehner's motion for new trial and whether the newly discovered evidence is material under *Brady*, 373 U.S. 83, 84, 83 S.Ct. 1194, 10 L.Ed.2d 215." *Id.* at ¶ 33.

{¶ 11} On remand, the trial court scheduled a hearing to determine the materiality of Anderson's and Jenkins's statements pursuant to this court's mandate in *Buehner*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432. However, the state moved to expand the scope of the hearing to allow witnesses to explain where the alleged exculpatory evidence had been maintained and whether it was communicated to the defense team. Buehner opposed the motion but also raised claims that additional exculpatory evidence, not addressed in *Buehner II*, had been withheld. Specifically, Buehner argued that this additional evidence, including the statement of Wilhelmina Mason ("Mason") dated July 3, 2001, further supported his claims for a new trial.

{¶ 12} The trial court granted the motion to expand the scope of the hearing in part. In the judgment entry partially granting the motion, the court explained that there has not been an evidentiary hearing with respect to any of the exculpatory evidence and Buehner's "latest allegations require an evidentiary hearing." Therefore, the trial court ordered that Buehner "may bring public evidence bearing

on all exculpatory evidence, discovery of same to defendant and its materiality in defendant's conviction."

{¶ 13} The matter proceeded to a hearing on November 25, 2019. At the *Brady* hearing, defense counsel presented the testimony of Anderson, who verified that on September 27, 2001, she provided a statement to investigating detectives concerning the May 24, 2001, shooting death of Saunders. Consistent with the statements set forth in the police report, marked defendant's exhibit A, Anderson testified that during the early hours of May 24, 2001, she was lying on her bed when she heard a commotion outside. Anderson stated that when she looked outside her bedroom window to assess the situation, she observed "two young black guys running." (Tr. 14.) She explained:

> [T]hey ran through my yard. And when — as they was running, the black man got out the car and shot this kid. * * *

> So we called the police and the police came. And we told the police it was four black guys got out a black truck and shot this kid.

(Tr. 14.)

{¶ 14} Throughout her testimony, Anderson continuously stated that the shooter was black. She explained: "Wasn't no white guy there. They all black." (Tr. 27.) Anderson described the shooter as "a light complexed [sic] black male * * * hair in braided hairstyle, slim build, 5′10″, in mid 20's." (Tr. 22, defendant's exhibit A.) In addition, Anderson described another suspect from the truck "as a darker complexed [sic] black male, medium build, 5′3″ in height, low haircut, wearing

glasses and white suit." (Defendant's exhibit A.) Thus, Anderson maintained that Buehner was not the shooter who killed Saunders. (Tr. 17.)

{¶ 15} In this regard, Anderson's testimony was consistent with her statement to the investigating detectives, wherein she

> was also adamant concerning the fact the occupants of the black pickup truck were all black males and everyone on the street, especially at the corner house, knew who these individuals were.

(Defendant's exhibit A.) Anderson further expressed that "[s]he could only offer the fact everyone was saying the individuals were white males in order not to tell who actually did the shooting." (Tr. 16, defendant's exhibit A.)

{¶ 16} On cross-examination, Anderson verified that she was not wearing her prescription eyeglasses when she observed the shooting. (Tr. 21.) Anderson did not recall what her prescription strength was in May 2001, but she stated that she did not need her glasses to identify the suspects' race. (Tr. 28.) Moreover, Anderson denied drinking alcohol prior to making her statement to the detectives despite the notation in the report that "it was also apparent this female [Anderson] was under the influence of alcohol at the time of our arrival."

{¶ 17} Detective Sahir Hasan ("Det. Hasan") testified that at the time of the incident he was employed by the Cleveland Division of Police and was assigned as the lead detective in this case. Det. Hasan testified that he responded to the crime scene on the night of May 24, 2001, with Detective Gary Garisek ("Det. Garisek"). (Tr. 71.) In his report of the original investigation dated May 24, 2001, Det. Hasan noted that there were three individual suspects in a black or dark blue pickup truck:

one white male, one black male with a "very light complexion," and one black male with a "dark complexion." (Tr. 72, defendant's exhibit I.) According to Det. Hasan's report, Brenda Dennis ("Dennis"), the victim's sister, told police that the shooter was an albino black male with dyed orange hair, and the driver of the truck was a white male. (Defendant's exhibit I.)

{¶ 18} Det. Hasan confirmed that during the course of the investigation, detectives performed documented interviews with Tierra, Antoine, Jenkins, and Anderson. (Defendant's exhibit J.) In relevant part, Det. Hasan agreed that a witness identifying a different race of a potential suspect is a very important aspect of a criminal investigation. However, he maintained that Anderson's statement was not consistent with "other viable information as to the suspects and the vehicles involved in this incident." (Tr. 90.) In part, this "viable information" included information provided by a confidential informant who linked Buehner and Price to the shooting.

{¶ 19} Det. Hasan also verified the witness statement of Mason taken on July 3, 2001. While investigating a black GMC pickup truck believed to be involved in another homicide, detectives discovered that the black GMC pickup truck was registered to Mason. Det. Hasan explained that because the truck matched the description of the vehicle involved in Saunder's death, the detectives went to Mason's house to question her about the vehicle. In her police statement, marked defendant's exhibit H, Mason stated that black GMC pickup truck actually belonged to Robert "Sonny" Allen ("Sonny"), whom she described as a "light complexed [sic]

black male * * * 5′10″ to 6′0″ * * * nice hair in braids * * * 50 to 52 years old * * * .” Mason acknowledged that she obtained license plates for the vehicle on Sonny's behalf because he did not have a valid driver's license. (Defendant's exhibit H.)

{¶ 20} Relevant to this appeal, Mason notified the police that she had been confronted by Edwards about the black GMC pickup truck because "the truck looked exactly like the one that was used when Worm [Jerry Saunders] was killed." (Defendant's exhibit H.) In fact, Mason expressed to the detectives that "she had a feeling about the truck being the one involved in [Saunders's] homicide since hearing about it and being asked by Robert Allen to obtain the plates." According to Mason, Edwards stated that he saw "the black truck" immediately after Saunders was shot and that Sonny and an individual identified as "Victor" were inside the truck. Mason described Victor as a "skinny * * * dark complexed [sic] black male." Edwards also stated that he observed "one of the white males" in the truck brandish a gun and shoot Saunders. (Defendant's exhibit H.)

{¶ 21} Det. Hasan admitted that Sonny was never questioned or taken into custody. He further conceded that the statements Edwards allegedly made to Mason were inconsistent with the statements Edwards provided to the investigating detectives. However, Det. Hasan testified that it was the position of the investigating detectives that the black truck linked to Mason and Sonny was not involved in Saunders's shooting. (Tr. 98.)

{¶ 22} Det. Hasan was also questioned at length about Dennis and her involvement in the investigation into her brother's death. Det. Hasan confirmed

that during the pendency of this case, Dennis frequently provided detectives with information she gathered from potential witnesses in her neighborhood. In a statement dated May 10, 2002, approximately one month before Buehner's trial, Dennis identified Eric Grant ("Grant"), also known as "Country," as a possible murder suspect. (Tr. 85-86, defendant's exhibit L.) Dennis described Grant as "a black male, medium build 5′7″ tall, brown skin, and clean cut." Det. Hasan confirmed that police attempted to locate Grant, but they never found him, and there was no further investigation into that lead. (Tr. 87.)

{¶ 23} Criminal defense attorney, James Kersey (hereinafter "trial counsel 1") testified that he and defense attorney, Thomas Gill (hereinafter "trial counsel 2") (now deceased) (collectively the "defense team") represented Buehner at trial in 2002. At the onset of his testimony, trial counsel 1 acknowledged that he had lost Buehner's case file in or about 2014 and, therefore, did not have access to the notes he took during the pendency of discovery in this case. Nevertheless, trial counsel 1 testified that, in accordance with his common practice, he requested discovery from the state, including (1) a written list of the names and addresses of all witnesses whom the prosecuting attorney intended to call at trial, and (2) "all evidence favorable to the defendant pursuant to Civ.R. 16(B)(1)(f)." In its response, the state identified 15 nonpolice witnesses by name and address, including Anderson, Jenkins, Antoine, and Tierra. However, certain witnesses, namely Det. Garisek, Mason, Grant, Sonny, and ballistics expert, Victor Kovacic, were not identified as potential state witnesses. In addition, the state indicated that "[n]o exculpatory

material [wa]s available to or in the possession of the Prosecuting Attorney." (Defendant's exhibit O.) Trial counsel 1 expressed that he interpreted the discovery response as an indication from the state that "there was nothing that was favorable to the defendant to exonerate him from the alleged crime." (Tr. 118.)

{¶ 24} Despite the state's initial discovery response, trial counsel 1 subsequently filed two separate motions requesting the state to disclose specific exculpatory evidence, including any "evidence which may be used to impeach a witness/es * * * [including], but not exclusively, inconsistent statements of witnesses or between witnesses," and any "statements of all persons who were observed to have been near, in, or made observations with respect to persons who were near [the scene] on [May 24, 2001] including but not limited to * * * Debbie Anderson; * * * Gail Jenkins; * * * Tierra Edwards; * * * [and] Antoine Edwards." (Defendant's exhibits Q and R.) When asked if he received anything in response to these motions, trial counsel 1 stated, "I don't think so." (Tr. 121.) He maintained, however, that he would have recalled receiving exculpatory evidence from the state.

{¶ 25} With respect to Anderson, trial counsel 1 conceded that trial counsel 2 attempted to contact her on more than one occasion. However, Anderson indicated that she knew nothing about Saunders's murder and that she did not want to get involved. Accordingly, the defense team decided not to pursue Anderson or subpoena her for trial because they had no knowledge of the exculpatory statement she made to police, and the state indicated there was no exculpatory evidence. (Tr. 122-124.) Trial counsel 1 testified that he first saw Anderson's statement after

Buehner sought leave to file a motion for new trial in 2014. (Tr. 124, 130.) He explained: "I was surprised to see it, to tell the truth." (Tr. 124.) Trial counsel 1 testified that had he known about Anderson's statements, he would have subpoenaed her for trial because she identified the shooter as a black male, whereas Buehner is white. (Tr. 125.) In the opinion of trial counsel 1, identifying a suspect of a different race than the defendant's race is absolutely "material." (Tr. 125.)

{¶ 26} Trial counsel 1 also testified that he was never provided with Mason's statement before trial. (Tr. 126.) Trial counsel 1 explained that he did not interview or subpoena Mason for trial because he did not know she existed; she was not on the state's witness list, and 1rial counsel 1 had "never read the content of her statement." (Tr. 126.) Trial counsel 1 testified that had he known that Edwards had told Mason that Sonny and Victor were in the black truck immediately after the shooting, he would have used Mason's statement to impeach Edwards at trial. (Tr. 127, 132.) Trial counsel 1 further stated that he would have subpoenaed Mason to testify at Buehner's trial if he had known about her.

{¶ 27} Former state prosecutor, Richard Bombik (hereinafter the "trial prosecutor"), confirmed that he tried the case against Buehner in 2002, and actively participated in the discovery phase of trial. The trial prosecutor was questioned at length regarding the strength of the state's case and the evidence used to support Buehner's convictions. Given the lack of forensic and physical evidence linking Buehner to the shooting, the trial prosecutor acknowledged that the state's case

relied heavily on the testimony provided by Price and Edwards, despite contested issues relating to their credibility as witnesses.

{¶ 28} The trial prosecutor was also questioned about his discovery practices and his specific recollection of disclosures to the defense team in this case. The trial prosecutor expressed that although he did not permit the defense team to handle or make copies of relevant documents in the days of "closed discovery," he would read the substance of each document aloud during pretrials and allow defense attorneys to take notes.

{¶ 29} Relevant to this appeal, the trial prosecutor confirmed that he indicated in the state's response to discovery requests, and again at the onset of the jury trial, that "no exculpatory material [wa]s available to or in the possession of the prosecuting attorney." The trial prosecutor also testified that he prepared a witness list containing individuals he deemed germane to the case. The trial prosecutor did not dispute that Mason was never identified as a witness to Buehner's defense team. (Tr. 178, 182.) He also admitted that Det. Garisek was not identified as a witness and that he should have been disclosed to the defense. (Tr. 178-180.) Lastly, the trial prosecutor conceded that he had never seen Dennis's May 10, 2002 statement related to Grant, the black male whom Dennis indicated was a potential suspect. Because he never saw the statement, he admitted that he never could have read the content of it to the defense team in advance of trial. (Tr. 227.)

{¶ 30} With respect to Anderson, Jenkins, and Tierra, the trial prosecutor testified that he had no reason to believe that he did not disclose all exculpatory

evidence to the defense team in accordance with his common practices. However, the trial prosecutor admitted that he had no specific recollection of reading these witness statements to the defense team, stating "No, I don't have a specific recollection, no I don't." (Tr. 273.) The trial prosecutor further admitted that he did not "attach a lot of significance" to Anderson's statement because (1) she did not contact the police on her own, (2) she was under the influence of alcohol at the time she gave her statement to the police, and (3) her statement contradicts the detailed testimony of Price and Edwards. Thus, the trial prosecutor opined that he did not believe "anybody can reach a conclusion that there weren't two white people involved in this crime. I don't see how you possibly reach that conclusion." (Tr. 220.) The trial prosecutor reached this conclusion despite acknowledging that his own initial investigation report, dated May 24, 2001, listed the suspects as being "one white male and two black males." (Tr. 241, defendant's exhibit I.)

{¶ 31} In an order dated April 16, 2020, the trial court denied Buehner's motion for new trial. In relevant part, the court concluded that no exculpatory evidence had been withheld from the defense, no exculpatory evidence existed, Buehner's trial counsel was not ineffective for failing to utilize evidence at trial, and the state did not elicit false testimony. The trial court also found that "[e]ven if some indication exists that information was not disclosed, its materiality to the outcome of this trial is doubtful." (Opinion and order dated April 16, 2020.)

{¶ 32} Buehner now appeals from the trial court' judgment.

## II. Law and Analysis

### A. Scope of Remand

{¶ 33} For the purposes of clarity, we address Buehner's assignments of error out of order. In his third assignment of error, Buehner argues the trial court erred by expanding the scope of this court's remand. Buehner contends that by expanding the scope of the remand hearing, "the trial court did not follow the mandate of [this court] and reverse the previous findings [made on appeal] to obtain an unjust result." For the reasons that follow, we are unpersuaded by Buehner's characterization of the court's prehearing judgment.

{¶ 34} As set forth above, this court previously reversed the trial court's August 2017 judgment and remanded the case to the trial court "to consider Buehner's motion for new trial and whether the newly discovered evidence is material under *Brady*, 373 U.S. 83, 84, 83 S.Ct. 1194, 10 L.Ed.2d 215." *Buehner II*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432, at ¶ 33. Although this court determined that Anderson's and Jenkins's statements regarding the race of the shooter were (1) not disclosed to the defense team, and (2) exculpatory, we are unable to conclude that the trial court erred by permitting the parties to present expansive evidence regarding "all exculpatory evidence, discovery of the same to defendant, and its materiality in defendant's conviction[s]."

{¶ 35} Buehner correctly states that the law-of-the-case doctrine provides that "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial

and reviewing levels" and "the doctrine functions to compel trial courts to follow the mandates of reviewing courts." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). As it pertains to the scope of the hearing on remand in this case, however, testimony concerning the criminal investigation and the subsequent discovery process was relevant to the determination of whether the disputed evidence was material. Moreover, Buehner also raised new claims of previously undisclosed evidence on remand, which were not part of this court's prior decision, but are relevant to deciding whether the suppression of exculpatory evidence warrants a new trial. Given the trial court's prior resolution of Buehner's motions without a hearing, we agree that it was proper to allow the detectives and attorneys associated with the case to provide context to the existing record. Accordingly, we find the trial court was justified in expanding the scope of the hearing on remand to consider these issues.

{¶ 36} The third assignment of error is overruled.

### B. Material Evidence

{¶ 37} In the first, second, fourth, and fifth assignments of error, Buehner argues the trial court erred in finding that he failed to establish a *Brady* violation. In the fourth assignment of error, Buehner asserts the trial court erred in finding that the state did not withhold evidence. We discuss these assigned errors together because they are all related to Buehner's alleged *Brady* violation.

{¶ 38} Pursuant to the United States Supreme Court's decision in *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Therefore, in order to establish a due process violation under *Brady*, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching; (2) was willfully or inadvertently withheld by the state; and (3) the defendant was prejudiced thereby. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), citing *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct.1936, 144 L.Ed.2d 286 (1999).

{¶ 39} Exculpatory evidence is defined as evidence favorable to the accused, which "'if disclosed and used effectively, * * * may make the difference between conviction and acquittal.'" *State v. Newell*, 8th Dist. Cuyahoga No. 106584, 2019-Ohio-976, ¶ 36, quoting *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 70, citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *See also State v. Glover*, 2016-Ohio-2833, 64 N.E.3d 442, ¶ 41 (8th Dist.) ("Exculpatory evidence is evidence that would tend to exculpate a defendant of guilt or reduce a defendant's penalty. This is the 'favorable' evidence contemplated under *Brady* and its progeny, which also includes impeachment evidence bearing on the credibility of the state's witnesses.").

{¶ 40} In turn, "evidence is considered material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 16, quoting *Bagley* at 682. "A reasonable probability does

not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine * * * confidence in the outcome of the trial.'" *Lemons v. State*, 8th Dist. Cuyahoga No. 109188, 2020-Ohio-5619, ¶ 65, quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶ 41} Furthermore, a court should consider the cumulative effect of all nondisclosures in determining whether reversal is required. *Glover* at ¶ 34, citing *Kyles* at 419. "'Whereas each bit of omitted evidence standing alone may not be sufficiently material to justify a new trial, the net effect, however, may warrant a new trial.'" *Id.*, quoting *State v. Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928, ¶ 33. However, a reviewing court may dismiss an alleged *Brady* violation where favorable evidence was suppressed "'where the admissible evidence comprises overwhelming proof of the defendant's guilt.'" *Id.* at ¶ 45, quoting *State v. Campbell*, 4th Dist. Adams No. 13CA969, 2014-Ohio-3860, ¶ 19.

{¶ 42} The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. *See United States v. Agurs*, 427 U.S. 97, 107, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope." *U.S. v. Price*, 566 F.3d 900, 907 (9th Cir.2009). The prosecution is responsible for disclosing not only what is in the prosecutor's case file, but any information known to the prosecutor or any investigating officers or

members of the prosecution team. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). However, no *Brady* violation occurs when the undisclosed evidence is cumulative to evidence already known by the defense at the time of trial. *See State v. Cook*, 1st Dist. Hamilton No. C-950090, 1995 Ohio App. LEXIS 5768, 3 (Dec. 29, 1995). There is also no *Brady* violation "if the evidence that was allegedly withheld is merely cumulative to evidence presented at trial." *State v. Bonilla*, 2d Dist. Greene No. 2008 CA 68, 2009-Ohio-4784, ¶ 26.

{¶ 43} The defendant bears the burden of demonstrating that a *Brady* violation rises to the level of a denial of due process. *Glover*, 2016-Ohio-2833, 64 N.E.3d 442, at ¶ 35. Whether a *Brady* violation is material is a question of law subject to de novo review. *Id.* "Under a de novo standard of review, we give no deference to a trial court's decision." *Brownlee v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 97707, 2012-Ohio-2212, ¶ 9, citing *Akron v. Frazier*, 142 Ohio App.3d 718, 721, 756 N.E.2d 1258 (9th Dist.2001).

{¶ 44} On appeal, Buehner argues the trial court ignored credible evidence in order to reach the conclusion that he failed to establish a *Brady* violation. Buehner contends the evidence presented at the *Brady* hearing unquestionably demonstrates that the state failed to disclose relevant and favorable evidence to the defense team prior to trial, including (1) the police statements made by Anderson, Jenkins, Tierra, and Mason; (2) information relating to Det. Garisek's involvement

in the investigation; and (3) the identification of a potential third suspect. Thus, Buehner asserts that viewing the material exculpatory evidence together, and in conjunction with "the weakness of the [s]tate of Ohio's case against [him]," "there is no plausible way the trial court could properly reach the conclusion that [his] constitutional rights were not violated."

{¶ 45} In contrast, the state maintains that the record conclusively establishes that it did not suppress the oral statements made by Anderson, Jenkins, Tierra, or Antoine. The state contends that the testimony presented at the *Brady* hearing demonstrated that (1) these individuals were named in the witness list, (2) the subject statements were provided to the prosecutor's office, (3) the statements were within the state's file, and (4) it was the prosecutor's common practice to read each statement contained in the case file to the defense during the discovery process. With respect to Mason and information relating to Sonny, the state suggests that based on the questions posed by the defense team during the underlying trial, it can logically be inferred that information regarding Sonny and the black truck registered to Mason were disclosed to the defense team during pretrial proceedings.

{¶ 46} The state further asserts that the allegedly exculpatory evidence was not material in light of the overwhelming evidence supporting Buehner's guilt. The state notes that codefendant Price, who is a white male, admitted his involvement in the shooting and provided a detailed accounting of the events as they unfolded. In addition, Edwards, an eyewitness to the shooting and the preceding events,

consistently identified Buehner as the shooter throughout the pretrial and trial process.

{¶ 47} Before addressing the foregoing arguments, we preliminarily reject Buehner's unfounded and repeated assertions that the trial court arbitrarily reached a "predetermined outcome" prior to assessing the testimony presented at the *Brady* hearing. As exhibited by the thoroughness of the trial court's decision, it is evident the trial court diligently considered the arguments posed by the parties, carefully weighed the credibility of the witnesses, and provided Buehner with a full and fair opportunity to litigate his motion for new trial. Although this court departs from several of the conclusions reached by the trial court, the record refutes all allegations of bias levied against the court during the pendency of this case.

{¶ 48} We now turn to the merits of Buehner's *Brady* claims. For the purposes of this appeal, our inquiry will focus exclusively on the allegedly undisclosed statements of Anderson, Jenkins, and Mason. As discussed further below, Buehner has repeatedly challenged the credibility of evidence placing him at the scene on the night of the shooting. In our view, the statements provided by Anderson, Jenkins, and Mason are directly relevant to the contested issue of identity, including specific information regarding the race, gender, and description of the alleged shooter, as well as information relating to the truck used to facilitate the crime. The remaining evidence disputed at the *Brady* hearing, while relevant,

required speculation about other *potential* leads or otherwise did not dispositively address the issue of identity.[3]

{¶ 49} Consistent with our prior holding in *Buehner II*, we find the statements made by Anderson and Jenkins during the early stages of the police investigation were exculpatory. As discussed, evidence is exculpatory when it is "favorable to an accused." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In this case, there has been much debate regarding the race of the individuals inside the black truck at the time of the shooting. In addition, the defense has suggested that the gun used to fatally shoot Saunders was fired from the driver's seat of the vehicle, a position alleged to have been occupied by Price.

{¶ 50} In this regard, the statements of Anderson and Jenkins provided essential information regarding the descriptions of the perpetrators and the location of the shooter inside the black truck. If believed, Anderson's statement suggests that a black male was responsible for Saunders's death. *Buehner II*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432, at ¶ 26. Similarly, Jenkins's statement, if believed, suggests that the individuals sitting in the middle and passenger seats of the black truck were black males. In addition, Jenkins's testimony expressed that the white male sitting in the driver's seat of the black truck was the person responsible for

---

[3] Buehner further argued that the state's failure to produce an expert report from its ballistics expert before trial warrants a new trial. However, as noted by Buehner in his appellate brief, the state's ballistics expert, Victor Kovacic, testified at trial that he conducted ballistics testing on evidence collected from the crime scene on the second day of trial. Therefore, Buehner knew about the state's failure to provide the expert report when he filed the direct appeal of his conviction, and it is not newly discovered evidence within the meaning of Crim.R. 33.

shooting Saunders. Such information would undoubtedly been favorable to Buehner and his efforts to discredit the state's witnesses while corroborating his own alibi.

{¶ 51} We recognize that the statements provided by Anderson, Jenkins, and Tierra varied from each other in certain aspects. We are also aware that Price, a white male, accepted responsibility for his role in the events. Significantly, however, the statements provided by Anderson and Jenkins do not place a gun in the hands of a white male sitting in the middle passenger's seat of the black truck. The statements were inconsistent with, and in some instances contradictory to, the testimony presented by the state's primary witnesses, Price and Edwards. Under these circumstances, we find Anderson's and Jenkins's statements constituted exculpatory evidence that should have been produced during the discovery process.

{¶ 52} We further find the information set forth in the statement provided by Mason was favorable evidence that should have been disclosed to the defense team. Throughout these proceedings, there has been much debate regarding the identity of the third perpetrator and the make, model, and ownership of the black truck used during the shooting. Edwards testified that the truck was a "black, GMC small body pickup," whereas Price testified that the truck was a "regular-sized" Dodge Ram pickup. (Trial tr. 476, 635.). Locating and analyzing the truck was certainly important to the investigation because it may have provided a direct link to the perpetrators. Although Det. Hasan testified that the detectives discovered a truck believed to be involved in the shooting, the trial prosecutor confirmed that the

prosecution could not confirm the identity of the truck used in the incident. (Tr. 209-210.)

{¶ 53} Here, Mason expressed in her statement to detectives that Edwards "confronted" her about a 1993 black GMC pickup truck that was registered under her name because the truck "looked exactly like the one used when [Saunders] was killed." He also informed Mason that "he saw the black truck immediately after the shooting with [Sonny] and Victor inside." The record reflects that in response to Mason's statement, the detectives interviewed Edwards and confronted him about Mason's truck and Sonny's potential involvement in the shooting. In a statement, dated July 24, 2001, Edwards expressed to the detectives that Sonny "was not the black male inside the black colored truck that night and had no involvement in this case." (Defendant's exhibit Y.) Edwards conceded that Sonny did have a truck similar to the one used in the shooting but that Sonny's truck was in worse condition.

{¶ 54} The state suggests that Mason's statement was not exculpatory because Edwards later clarified that Sonny and the black GMC pickup truck were not involved in the shooting. We disagree. Viewing Mason's statement in its entirety, a reasonable person could conclude that Edwards confronted Mason because he believed her vehicle was used in the shooting death of Saunders. Edwards's use of the phrase, "the black truck," when referring to the vehicle he observed Sonny inside "immediately" after the shooting is relevant. In addition, Mason indicated that the confrontation caused her to believe that the black GMC pickup truck was the vehicle "involved in [Saunders]'s homicide." At the very least,

Mason's statement could be used to impeach Edwards's July 24, 2001 statement and his testimony at trial that Sonny was not the third, unidentified male inside the truck on the night of the shooting. For these reasons, trial counsel 1 testified that had he known of Mason's existence and her statement to police that Robert "Sonny" Allen was a potential suspect in Saunders's death, he would have subpoenaed her to testify at trial. (Tr. 128.)

{¶ 55} Having determined that the foregoing statements contained favorable information to the defense, we now turn to the highly contested issue of whether these statements were disclosed during the closed discovery process utilized in 2001.

{¶ 56} In addressing this issue, we begin by acknowledging the professionalism of the attorneys involved in Buehner's prosecution and defense, as well as the credibility of these witnesses to the extent their testimony relied on their memory and common practices. Unfortunately, however, the passage of time, the defense team's inability to locate their case file, and the nature of the discovery process used at the time of pretrial discovery in this case has created an untenable situation where the trial court was left to rely on speculative statements and accounts of what the trial prosecutor and trial counsel 1 believed they would have done under normal circumstances. During the *Brady* hearing, both the trial prosecutor and trial counsel 1 demonstrated, albeit justifiably, the inability to have specific recollections of critical issues. For instance, the trial prosecutor did not dispute that he had no specific recollections concerning the disclosure of the

statements provided by Anderson, Jenkins, and Mason. (Tr. 183-184, 226-227, 272-273.) He stated:

> Q: You also don't have any specific recollection of the day that any of those reports would have been read to anyone?
>
> A: No, I don't have a specific recollection, no I don't. No.

(New trial tr. 273.) In turn, the state demonstrated that trial counsel 1 could not specifically recall other aspects of the case, including specific testimony and evidence presented at trial, the basis of specific questions posed on cross-examination, or the information that prompted him to file additional discovery requests. (Tr. 130-131, 142-144.)

{¶ 57} Despite their faded memories, however, the trial prosecutor maintains that he had no reason to believe he would not have disclosed the statements pursuant to his common practice of meticulously reading each statement to counsel; while trial counsel 1 emphatically claims that he would have utilized these statements in his defense had they been disclosed because they directly addressed contested issues concerning the identity of the shooter. (Tr. 124-131.)

{¶ 58} Without questioning the truthfulness of the testimony presented at trial, or the good faith efforts pursued by all parties during the discovery process, it is imperative to focus on the objective, verifiable information in the record. As this court stated in *Buehner II*, there is no dispute that the state indicated in its discovery requests that "[n]o exculpatory material [wa]s available to or in the possession of the prosecuting attorney." *Buehner II*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432, at ¶ 23. It is equally uncontested that trial counsel 1 subsequently filed

motions requesting the statements of all persons who were believed to have information regarding the shooting, including Anderson and Jenkins. At the *Brady* hearing, trial counsel 1 did not recall receiving a response to this discovery request, but confirmed that he "never received from the state of Ohio any exculpatory evidence." (Tr. 121-122.) Trial counsel 1 further explained that he only filed the additional discovery requests for specific exculpatory evidence in order to "lock [the state] into" its initial response "on the file that indicate[d] that there [wa]s no exculpatory evidence." (Tr. 122.)

{¶ 59} In its written opinion, the trial court determined that trial counsel 1's motion for specific exculpatory information, marked defendant's exhibit R, contained language that "infers knowledge of the information from Jenkins and Tierra" through discovery. In support of its position, the trial court cited a paragraph from the motion, which states, in relevant part:

> Based on pre-trial disclosures by the state of Ohio and investigation by the defense it was discovered that a number of persons were arrested and interviewed within 48 hours of the shooting. Also, statements were allegedly made suggesting that Randy Price was present and the perpetrator of the offense. In addition, witnesses supposedly made observations about persons in the car.

{¶ 60} When confronted with the statement contained in the discovery motion, trial counsel 1 indicated that the motion was referring to information drawn from the known statements made by Price and Edwards. (Tr. 151-153.) More significantly, however, the nature of the request demonstrates, without speculating, that the defense team had not yet been provided with any specific statements

regarding other potential eyewitnesses as of the time of the filing. At the very most, the motion demonstrated that that the defense learned that individuals listed on the state witness list may have made statements helpful to the defense through their own independent investigation, but the content of those statements were not disclosed by the state. Trial counsel 1 explained that if he had information relating to favorable statements from a specific witness, he would have listed that person by name in the motion. (Tr. 155.) Under these circumstances, we cannot join the trial court's conclusion that the language contained in the discovery motion illustrated the state's disclosure of relevant statements.

{¶ 61} We acknowledge that Anderson and Jenkins were named in the witness list disclosed to the defense team. However, this did not relieve the state of its obligation to disclose their exculpatory statements particularly where, as here, those statements were specifically requested during the discovery phase of trial. *See State v. Johnston*, 39 Ohio St.3d 48, 61, 529 N.E.2d 898 (1988), fn. 22. Trial counsel 1 explained that because the state indicated "on numerous occasions" that there was no exculpatory evidence, he had no reasonable expectation that any witnesses had made exculpatory statements. (Tr. 130.) And, unlike Anderson and Jenkins, the state concedes that Mason was not listed on the witness list provided during discovery. (Tr. 183.) As such, trial counsel 1 testified that he was completely unaware of Mason's existence as a witness and, therefore, could not have reviewed her statement or contacted her prior to Buehner's trial. (Tr. 126.)

{¶ 62} Consistent with our prior decision, we reiterate that the objective facts in this record support the conclusion that "Buehner had no knowledge of the exculpatory information contained in the undisclosed police reports. Nor did he have any reason to believe that the police reports contained improperly suppressed exculpatory evidence because the state represented that no exculpatory evidence existed." *Buehner II*, 8th Dist. Cuyahoga No. 106319, 2018-Ohio-4432, at ¶ 30. Deferring to the need to uphold the constitutional protections afforded to criminal defendants and in the absence of specific recollections or documentary evidence to establish clear disclosures, we decline to reject Buehner's *Brady* claims based on the state's reliance on probabilities or assumptions. Accordingly, we find competent, credible evidence supports a finding that the state failed to disclose to the defense exculpatory evidence contained in Anderson, Jenkins, and Mason's statements. We, therefore, find that the trial court erred in concluding that no exculpatory evidence was withheld from Buehner in advance of his trial.

{¶ 63} Finally, having reviewed the evidence alleged to have been suppressed, we conclude that there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed to the defense.

{¶ 64} As discussed, the state argues that the suppressed statements are not material because they cannot overcome or diminish the collective persuasiveness of the state's evidence at trial. Specifically, the state notes that (1) Price, a white male, accepted responsibility for his role in the shooting; (2) Edwards, an eyewitness to the shooting, identified Buehner as the shooter; and (3) Henry Harris ("Harris"), an

unbiased witness, observed two white males and one black male in the black truck used by the perpetrators. The state further challenges the credibility of the allegedly exculpatory evidence, arguing the descriptions provided in the disputed statements were inconsistent with other witness accounts and evidence presented at trial. The trial court agreed, finding Anderson, Jenkins, and Mason would not have been useful witnesses to the defense.

{¶ 65} We disagree with the state's assessment of the exculpatory evidence as well as the strength of its own case. In this case, the state's prosecution of Buehner relied primarily on the identification testimony of Price and Edwards, as well as the description of the perpetrators provided by Harris. There was no physical or forensic evidence connecting Buehner to the shooting or the truck used during the commission of the crime. Thus, information concerning the descriptions and identities of the three individuals located within the black truck was critical. The statements provided by Anderson and Jenkins went to the heart of these issues and provided descriptions of the event as it unfolded without bias and from a different vantage point. Moreover, Mason's statement provides insight into Edwards's state of mind and his potential suspicions concerning the shooter in the days following Saunders's death. While Edwards subsequently attempted to clarify his statements to Mason by specifically stating that Sonny and the black GMC pickup truck were not involved in the shooting, Mason's statement could certainly be used to impeach or discredit Edwards testimony as the statement, taken on its face, gives the

impression that their conversation caused Mason to develop "a feeling" that her vehicle and, in turn, Sonny, were involved in the shooting. (Defendant's exhibit H.)

{¶ 66} With respect to Price and Edwards, the record reflects that several jurors were initially hesitant to accept their testimony as true, presumably based on their criminal histories and the considerations provided by the state in exchange for their testimony.[4] During deliberations, the jury foreperson gave the judge a note, which stated, in relevant part:

> We are unable to arrive at any conclusion. Two of the members of our jury do not accept the testimony of either Edwards or Randy Price that Michael Buehner was involved in the shooting. Based on their past history and their activities and character[,] they do not believe the testimony of [Edwards] or [Price] that Michael Buehner was in the truck or participated in the shooting. We have had three hours of discussion on this issue and there has been no change in the opinion of these two jurors.

{¶ 67} It is quite possible that other jurors would have joined in their disbelief had Mason's statement been used to impeach Edwards testimony concerning Sonny and the truck used during the incident and had Anderson testified that the suspects involved in the shooting were all black. Interestingly, Anderson's description of the

---

[4] Price pleaded guilty to one count of involuntary manslaughter and one count of aggravated robbery in exchange for his testimony at Buehner's trial.

Edwards testified at trial that he was not promised any considerations from the state in exchange for his testimony in this case. (Trial tr. 555.) In the motion for new trial, however, Buehner noted that Edwards (1) "only provided his statement [linking Buehner to the shooting] after communicating with various other individuals [in his neighborhood] and while he was arrested on outstanding warrants," and (2) "appears to have received a lessened sentence for his pending [drug trafficking] cases as a result of his testimony in this case."

shooter is consistent with Mason's description of Sonny, i.e. a 5′10″, black male, with a light complexion, and braided hair.

{¶ 68} We recognize that the eyewitness account provided by Jenkins was inconsistent with the statement provided by Anderson in some aspects. However, Jenkins's testimony that the white male sitting in the driver's seat of the black truck was the shooter may have provided the jury with a further basis to question Price's testimony and his motive to incriminate another individual. In addition, there is no dispute that, similar to Harris, the statements provided by Anderson, Jenkins, and Mason were made without bias and without incentives to fabricate. Presented with numerous accounts regarding the race, description, and location of the shooter in the black truck, a jury would have had ample information before it to question whether the state proved its case beyond a reasonable doubt. The fact that the statements provided by Anderson, Jenkins, and Harris were inconsistent with each other in a number of respects is not harmful to Buehner's position, as the discrepancies in the statements only serve to diminish the certainty of the shooter's identity and his location inside the black truck.

{¶ 69} Lastly, we find it would be inappropriate to speculate, based on the information available at this time, that the statement provided by Anderson "could have been easily impeached." (Opinion and order dated April 16, 2020, p. 17.) In this case, Anderson admitted that she was not wearing prescription eyeglasses when she witnessed the murder, but she testified that she did not need them to see suspects' races. Although detectives claimed she was intoxicated when they arrived

at her home, unannounced, to take her statement, there was nothing to suggest that she was incoherent or that the alcohol she consumed affected her memory. Moreover, unlike Edwards and Price, the only eyewitnesses to actually testify at Buehner's trial, she had no apparent motive to lie about her observations.

{¶ 70} The trial court further concluded that Anderson lacked credibility because she claimed she told police at the scene that someone involved in the shooting was also present, but they ignored her. The trial court found this statement unbelievable. However, Edwards testified that he returned to the scene and walked by Saunders's body when police were arriving at the scene. (Trial tr. 491-492.) It is possible that if Anderson had been provided a photo array of Edwards, she would have identified him as the person she observed at the scene after the shooting. Therefore, we find no reason to dismiss her testimony for lack of credibility, particularly since she had no apparent reason to lie.

{¶ 71} Given the seriousness of the crimes involved, the nature of the evidence used to convict Buehner, and the passage of time between the jury trial and the *Brady* hearing, this case undoubtedly presents difficult questions of fact and issues of law. However, considering the significance of the evidence suppressed, we find that our confidence in the jury's verdict is sufficiently undermined. We find a reasonable probability exists that the jury would have reached a different decision if the exculpatory evidence had been known at trial. As such, we find the state's failure to disclose the statements of Anderson, Jenkins, and Mason constituted separate and distinct *Brady* violations that deprived Buehner of his right to due process.

Accordingly, the trial court erred by denying Buehner's motion for a new trial based on its determination that Buehner failed to establish a *Brady* violation. Buehner's first, second, fourth, and fifth assignments of error are overruled.

## C. Buehner's *Napue* Claim

{¶ 72} In the sixth assignment of error, Buehner argues the trial court erred when it summarily dismissed his claim that the state utilized false testimony in violation of *Illinois v. Napue*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

{¶ 73} Where a prosecutor knowingly uses perjured testimony, or fails to correct what he subsequently learns was perjury, the falsehood is deemed material for *Brady* purposes "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

{¶ 74} To establish a *Napue* claim, a defendant must show that (1) testimony was false, (2) the testimony was material, and (3) the prosecution knew it was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998). "The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id. See also State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001). As previously stated, a false statement is material for *Brady* purposes "'if the false testimony could * * * in any reasonable likelihood have affected the judgment of the jury * * *.'" *Giglio*, 405 U.S. at 154, 92 S.Ct. 763, 31 L.Ed.2d 104, quoting *Napue* at 271.

{¶ 75} On appeal, Buehner contends the state knew that Edwards provided perjured testimony at his trial. In this case, Edwards testified at trial that even though he was on probation for drug trafficking at the time of Saunders's murder, he was also selling crack cocaine at that time. Buehner asserts that because Edwards was never found in violation of his probation and was never charged with new drug charges even though Edwards told police he was selling drugs at the time of the shooting, the state must have known he would offer false testimony at Buehner's trial.

{¶ 76} However, there is no evidence establishing that Edwards offered perjured testimony or that the prosecutors knew he would offer perjured testimony. Here, Edwards was thoroughly cross-examined about his extensive involvement in drug trafficking and his prior and pending criminal cases. Although there were issues that affected Edward's credibility as a state's witness, including his criminal history, there is no indication that Edwards provided false testimony merely because he admitted to engaging in illegal activities with Saunders on the night of the shooting. Therefore, Buehner has failed to establish a *Napue* claim.

{¶ 77} The sixth assignment of error is overruled.

{¶ 78} The trial court's judgment is affirmed in part, reversed in part. We remand the case to the trial court for a new trial.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR